# Exhibit A

## Service of Process Transmittal Summary

**TO:**     Legal Process Shared
U.S. Bancorp
U.S. BANCORP CENTER, 800 NICOLLET MALL
MINNEAPOLIS, MN 55402-

**RE:**     **Process Served in Delaware**

**FOR:**    U.S. Bancorp  (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Re: SRINI NALLASIVAN // To: U.S. Bancorp |
| **DOCUMENT(S) SERVED:** | Letter, Complaint, Summons, Return, Motion, Certificate, Exhibit(s) |
| **COURT/AGENCY:** | Mecklenburg County - Superior Court Division, NC<br>Case # 25CV030195590 |
| **NATURE OF ACTION:** | Employee Litigation - Wrongful Termination - 02/06/2024 |
| **PROCESS SERVED ON:** | The Corporation Trust Company, Wilmington, DE |
| **DATE/METHOD OF SERVICE:** | By Traceable Mail on 07/15/2025 postmarked: "Not Post Marked" |
| **JURISDICTION SERVED:** | Delaware |
| **APPEARANCE OR ANSWER DUE:** | Within 30 days |
| **ATTORNEY(S)/SENDER(S):** | Victoria T. Kepes<br>The Noble Law Firm, PLLC.<br>700 Spring Forest Road, Suite 205<br>Raleigh, NC 27609<br>090-251-6008 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 07/16/2025, Expected Purge Date: 07/21/2025<br><br>Image SOP<br><br>Email Notification,  Legal Process Shared  legal.process@usbank.com |
| **REGISTERED AGENT CONTACT:** | The Corporation Trust Company<br>1209 Orange Street<br>Wilmington, DE 19801<br>8775647529<br>MajorAccountTeam2@wolterskluwer.com |

The information contained in this Transmittal is provided by CT for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other advisors as necessary. CT


disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.



Suite 205
Raleigh, NC 27609

$13.860
US POSTAGE
FIRST-CLASS
063S00131110S1
FROM 27609

9589 0710 5270 1716 8078 29

Corporation Trust Center
1209 Orange St.
Wilmington, DE 19801



July 9, 2025

**VIA CERTIFIED MAIL**

U.S. Bancorp
Legal Department
800 Nicollet Mall
Minneapolis, MN 55402

    **RE: Srini Nallasivan v. U.S. Bancorp and John Doe Nos. 1-10**
        **Mecklenburg County Superior Court Case No. 25-CV-030195-590**

To Whom It May Concern:

    Please be advised that The Noble Law Firm, PLLC, represents Plaintiff Srini Nallasivan in the above-referenced cause of action. This letter and the enclosed documents are being sent to you on behalf of Victoria T. Kepes, Esq.

    A lawsuit has been filed against U.S. Bancorp in the State of North Carolina, County of Mecklenburg Superior Court in the above-referenced cause of action. The Summons, Complaint and Demand for Jury Trial, and Motion for Admission *Pro Hac Vice* are being served on you.

    Enclosed please find the following:

- Summons in a Civil Action
- Complaint and Demand for Jury Trial
- Motion for Admission *Pro Hac Vice*

    If you have any questions or concerns regarding this matter, please feel free to contact our office. Thank you.

**Leveling the Field**

Noble Law

919.251.6008   704.626.6746   919.251.6008   864.656.9059

thenoblelaw.com



Sincerely,

**THE NOBLE LAW FIRM, PLLC**

Cicero Love, IV
Senior Litigation Paralegal
Office: (919) 251-6008
Direct: (919) 706-1574
Email: clove@thenoblelaw.com


Enclosures (3)



cc: (*VIA CERTIFIED MAIL*)
Corporation Trust Center
1209 Orange St.
Wilmington, DE 19801

**Leveling the Field**

Noble Law

thenoblelaw.com

Raleigh — 919.251.6008
Charlotte — 704.626.6746
Winston-Salem — 919.251.6008
South Carolina — 864.656.9059

Case 3:25-cv-00617 Document 1-1 Filed 08/14/25 Page 6 of 68

STATE OF NORTH CAROLINA
COUNTY OF MECKLENBURG

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
CASE NO.: __25CV030195-590__

SRINI NALLASIVAN,

Plaintiff,

v.

U.S. BANCORP; JOHN DOE NOS. 1-10,

Defendants.

**COMPLAINT**
**(JURY TRIAL DEMANDED)**

COMES NOW, the Plaintiff, by and through his undersigned counsel, and for his claims against the Defendants, states and alleges the following facts:

### INTRODUCTION

1.      This action is brought by Plaintiff Srini Nallasivan ("Plaintiff" or "Mr. Nallasivan") against U.S. Bancorp ("U.S. Bank") and Does 1-10 (collectively, the "Defendants")

2.      Defendants' violation of law was willful and egregious. After Mr. Nallasivan engaged in protected activity and reported that he was being discriminated against, harassed, and retaliated against (on multiple occasions), U.S. Bank refused to conduct a fair and unbiased investigation into his claims. It refused to interview any of his witnesses, and despite clear evidence that Mr. Nallasivan's claims were supported by facts, U.S. Bank proceeded to terminate Mr. Nallasivan. Further, Defendants have allowed its employees to further retaliate against Mr. Nallasivan by providing false statements about him to another financial institution which had already provided Mr. Nallasivan with an offer of employment. These defamatory statements were intended to prevent Mr. Nallasivan from finding new employment after he was illegally terminated by U.S. Bank. Unfortunately, these statements had their intended effect, and the financial

institution informed Mr. Nallasivan that they were withdrawing his offer based on the representations by U.S. Bank employees.

3.      As a result of Defendants' willful and unlawful conduct, Defendants are liable to Mr. Nallasivan for actual, compensatory, consequential, liquidated, treble, emotional distress, punitive, and other damages in an amount to be determined by a jury.

## THE PARTIES

4.      Plaintiff Srini Nallasivan is a resident of North Carolina, who maintains his residence or domicile in Mecklenburg County. At all times relevant, Mr. Nallasivan was employed by U.S. Bank.

5.      U.S. Bank is a Minnesota corporation, with an office in Charlotte, North Carolina. At all times relevant, Mr. Nallasivan was employed by U.S. Bank and worked from its Charlotte office. At all times relevant, U.S. Bank has had more than 500 employees in each of twenty (20) or more calendar weeks in the current or proceeding calendar year, and has been an "employer", pursuant to 42 U.S.C. § 12111(5)(A).

6.      The true names and capacities, whether individual, corporate, associate, partnership, or otherwise, of Defendants sued herein as DOES 1 through 10, inclusive, are unknown to Plaintiff, who therefore sue said Defendants by their fictitious names. Plaintiff allege that Defendants DOES 1 through 10 are in some manner responsible for Plaintiff's injuries and losses and are named in accordance with the provisions of N.C. Gen. Stat. § 1-166. Plaintiff will amend their complaint to show the true names and capacities of such fictitiously named Defendants as they are ascertained and their roles confirmed. Plaintiff further allege that the Defendants DOES 1 through 10, and each of them, were the agents, contractors, and/or employees of U.S. Bank, and the acts and omissions herein alleged were done by them, through such capacity and within the

scope of their authority, and that such conduct was ratified by Defendant U.S. Bank's agents, and that each of them is jointly and severally liable to the Plaintiff. As such, each Defendant named in this Complaint is legally responsible for the acts of the others causing permanent harm and irreparable injury to Mr. Nallasivan.

## JURISDICTION AND VENUE

7.     Venue and jurisdiction are proper in this Court.

8.     The amount in controversy exceeds $25,000.

9.     Mr. Nallasivan has satisfied all administrative prerequisites to the filing of this action.

## FACTUAL ALLEGATIONS

10.     For the past two decades, Mr. Nallasivan, an Indian-born, Asian and Hindu man, dedicated his professional career to the financial services industry. After spending approximately twelve years as Bank of America's Senior Vice President, Analytics, and another two years as AIG's Global Head of Digital Marketing and Data Analytics, Mr. Nallasivan joined U.S. Bank as its Senior Vice President, Chief Analytics officer in November 2018.

11.     Excited to bring his skills and expertise to U.S. Bank, Mr. Nallasivan was initially tasked with running U.S. Bank's data analytics, developing its artificial intelligence services by using complex modeling techniques for consumers, and various marketing and human resources responsibilities. This was a perfect fit for Mr. Nallasivan's skillset, as he is widely regarded as an artificial intelligence expert and currently sits on the advisory board of Carnegie Mellon University (the birthplace of artificial intelligence ("AI/ML").

12.     Moreover, Mr. Nallasivan has graduate degrees in engineering and management from the Massachusetts Institute of Technology (with six U.S patents in Artificial Intelligence and

wearable sensors from his original research and work at MIT), so his educational background and prior work experience was suited for this role. In prior years, Mr. Nallasivan also taught an executive education program on artificial intelligence and analytics at Carlson School of Management, University of Minnesota.

13.     Additionally, Mr. Nallasivan regularly trains executives in the usage and deployment of artificial intelligence, and has received numerous accolades at industry forums for delivering cutting-edge analytics and artificial intelligence work. Mr. Nallasivan was the keynote speaker at various national conferences where his work was lauded by peers and leaders in the industry. In addition, Mr. Nallasivan was a keynote speaker in 2023 at Adobe Summit (a leading conference with over 10,000 attendees), where he showcased the cutting-edge digital marketing program that he built over the years for U.S. Bank. In fact, Mr. Nallasivan and his team have received several patents and won several awards on behalf of U.S. Bank.

14.     Peers, colleagues, and students of Mr. Nallasivan regularly praise him for his expertise, his leadership, and his mentoring. He is known to be a collaborative and kind individual both to those that know him and individuals in the industry. Drawing upon his expertise, Mr. Nallasivan quickly demonstrated why he was a perfect fit for a leadership role at U.S. Bank.

**Mr. Nallasivan demonstrates the value he brought to U.S. Bank**

15.     Given his stellar work product and demonstrated expertise, U.S. Bank quickly expanded Mr. Nallasivan's role within the company and assigned additional responsibilities to him. This includes, but is not limited to, being assigned all business lines for U.S. Bank, such as commercial and corporate banking, wealth, and payments. Moreover, Mr. Nallasivan was responsible for covering all support functions, such as marketing, digital and finance. Once again, Mr. Nallasivan drew upon his graduate degrees in engineering and management from MIT to

succeed with these additional responsibilities. U.S. Bank eventually made Mr. Nallasivan responsible for U.S. Bank's overall enterprise analytics and AI/ML in 2019.

16.     From 2018 through 2022 (prior to being subjected to any discrimination, harassment, and/or retaliation), U.S. Bank regularly acknowledged Mr. Nallasivan's substantial contributions and the success (internally, within the industry and financially) that he was directly responsible for bringing to U.S. Bank. In 2020, Mr. Nallasivan was promoted to Executive Vice President in recognition for his hard work and dedication.

17.     Until he was subjected to discrimination, harassment, and retaliation, Mr. Nallasivan received glowing annual reviews from his supervisor and his colleagues including the Chief Executive Officer, multiple direct reports to the CEO, and members of the extended senior management team. In 2020, Mr. Nallasivan received a rating of "extraordinary performance." Further, Mr. Nallasivan had excellent "engagement" survey scores over the years which is extracted from survey responses from employees who rolled up to his supervisor.

18.     In 2020, he received a direct recognition and CEO award with additional compensation from Andy Cecere, Chief Executive Officer, and was told:

> The thanks is to you Srini. You are doing a great job leading an area of incredible importance and opportunity for our bank, and I am thankful you are on the team. Best, AC.

19.     In 2021, he received an "exceeding expectations" performance rating and was told by his manager:

> [e]ach January it is hard to imagine topping the last year, but for the third year in a row you have blown the prior year out of the water. On behalf of the bank, thank you for another tremendous year… as your 'spark' and joy you bring to work is infectious and one of the reasons your team and partners so enjoy working for/with you so much."

20.    The 2021 review was a 360 review and included numerous feedback from Mr. Nallasivan's colleagues, Vice Chairs, and business partners. The review demonstrates that Mr. Nallasivan's leadership team only had "strong praise" for Mr. Nallasivan and that he was well-liked for his collaborative efforts, positive attitude, and experience in a leadership role. These comments include the following:

- "Over my 15 years of working, as a leader, Srini is the only one that has kept me motivated and engaged…"
- "Srini is the best leader I've worked for."
- "The biggest strength that Srini has shown to me personally is his trust in his team and letting his leaders lead. There has *never* been a question if Srini has my back."
- "Srini is passionate about the people on his team. He is sensitive and recognize their needs and bats for them without any hesitation."
- "You worked hard to build some very strong relationships, particularly with revenue lines. These partners are quick to bring EAA into the fold and happy to share the limelight of success."
- "Srini has done an outstanding job of taking that on his shoulders and leads with strength, compassion, and clear direction. He always has the backs of his LT which is an admirable trait, his team respects him immensely as they have communicated to me."
- "Never in the history of U.S Bank do we have such advanced capabilities, kudos to the great work that you and team have been doing"

21.    The review goes on to compliment Mr. Nallasivan and states that Mr. Nallasivan created trust with business partners, that he was a leader that encourages his team, that he built strong relationships and collaborated well with others, and praised Mr. Nallasivan for his ethics and the trust that many others had with him.

22.    Just as was stated in his prior reviews, it was clear that Mr. Nallasivan was well-respected among his colleagues for being a compassionate and trustworthy leader, that he was seen as a reliable and truthful business partner, and was directly responsible for significant profits and loss avoidance for U.S. Bank.

23.     Mr. Nallasivan's performance review in 2022 was no different. The review complimented Mr. Nallasivan for keeping his team "intact and motivated" during the "chaos" given the "headwinds and massive uncertainty." In fact, the review praised Mr. Nallasivan for being able to have the best year in history for U.S. Bank and for having the greatest impact in EAA [Enterprise Analytics and Artificial Intelligence] history.

24.     Once again, the 360 review incorporated feedback from Mr. Nallasivan's peers. One peer represented that Mr. Nallasivan was "a shiny of[sic] example of how this should/could work across the company if we have role clarity and trust/respect for the people in those roles." Another statement represented "[t]here has never been an occasion when I asked for help and he said he could not." One senior leader and head of business line represented "Time and time again, you and team have put the needs of business line first, found ways to get things done when others could not and delivered amazing results. I have never had a more engaged and talented partner."

25.     With regard to Mr. Nallasivan's leadership, a colleague stated that Mr. Nallasivan had "the strength of teaching, always encouraging us to learn and grow." For 2022, Mr. Nallasivan was given a rating of extraordinary performance, (his fourth year receiving an extraordinary performance consecutively) especially since he had exceeded his revenue goal by at least three times, and in 2023, had contributed to building and launching analytics and AI/ML models & real-time triggers that directly resulted in 27 billion+ in CD deposit balance aka "new money", and was on track to achieve the highest range of his target for the following year. As Mr. Nallasivan represented in his evaluation, he had continued to develop positive relationships across business lines and with Vice Chairs which helped his team grow and continue to deliver in excess of their yearly targets and/or goals. It was clear that U.S. Bank valued Mr. Nallasivan greatly, and that his superiors and subordinates also shared this view about Mr. Nallasivan.

26.     During Mr. Nallasivan's employment at U.S. Bank, his group (Enterprise Analytics and Artificial Intelligence) had been directly responsible for financial revenue and loss savings / avoidance of over $600 million and several patents for the company in field of Artificial Intelligence. He and his team have exceeded their yearly performance goals by a multiple of at least three, and up to five for each year of his employment. Mr. Nallasivan was also rewarded for his hard work and received the CEO cash awards in 2020, 2021, and 2022, supporting all lines of business at U.S. Bank.

### Mr. Sakstrup is pushed out and Mr. Nallasivan is subjected to a campaign of discrimination and retaliation

27.     In September 2023, Mr. Sakstrup (Mr. Nallasivan's supervisor from 2018 to 2023) was pushed out of his interim Chief Strategy and Marketing Officer role, a position that he held for 18 months, for Michael Lacorazza, a white male. Mr. Lacorazza's title was Chief Marketing and Analytics officer, despite the fact that Mr. Lacorazza had no background in analytics and or AI/ML. Terrance R. Dolan, the Chief Administrative Officer since September 2023, was brought in and acted as Mr. Lacorazza's supervisor.

28.     The campaign of discrimination, harassment, and retaliation against Mr. Nallasivan was swift and targeted. On September 14, 2023, U.S. Bank surprised Mr. Nallasivan with a documented warning that falsely accused Mr. Nallasivan of failing to foster a climate conducive to "collaboration" and falsely accused Mr. Nallasivan of being combative, aggressive, and possessing a fear-based management style. The documented warning also baselessly questioned Mr. Nallasivan's ethics, accused him of hiding e-mails and domains, of circumventing regulations, and that he deliberately withheld information from business partners in an effort from providing an accurate overview for a marketing campaign. *Until this point, Mr. Nallasivan did not receive any complaints, warnings or issues about collaboration in the five years that he has worked there*

*and he received glowing performance reviews from the CEO and management team.* Finally, U.S. Bank accused Mr. Nallasivan of "manipulating" his metrics on a marketing campaign. Despite numerous verbal and written requests from Mr. Nallasivan to understand the accusations, neither Mr. Dolan nor Mr. Rojas (Senior Human Resources Leader) shared any specific evidence that supported the above claims. It was clear that U.S. Bank had "investigated" and came to a pre-determined conclusion.

29.     Notably, this was the first time Mr. Nallasivan was informed that there was an investigation into him. While an investigator had asked Mr. Nallasivan broad questions regarding the prospecting campaign for marketing and Mr. Nallasivan, the investigator did not disclose that U.S. Bank had concerns about either topics, nor the context of the investigation. Accordingly, Mr. Nallasivan was never given a chance to be informed of the allegations or respond to any allegations. In fact, the allegations brought by Mr. Dolan, Mr. Rojas, and the alleged investigation directly contradict the previous five years of performance reviews that Mr. Nallasivan received including directly from the CEO, and the 360 feedback every year that was gathered from Vice Chairs, senior leaders, his peers and colleagues by Kai Sakstrup.

30.     Mr. Nallasivan was informed by Ms. Ties, CBB business unit leader and other senior leaders that they had been interviewed regarding "digital marketing issues" and Mr. Nallasivan, but they were never informed that it was pursuant to an investigation into Mr. Nallasivan. Had they been informed, they would have denied any wrongdoing by Mr. Nallasivan and rejected any assertion that Mr. Nallasivan had collaboration issues with his colleagues. It is clear to Mr. Nallasivan that the investigation did not want to elicit truthful information about the prospecting campaign and/or his collaboration style. Instead, it was done with a predetermined

result and was intended to justify the discrimination, harassment, and retaliation that Mr. Nallasivan was subjected to.

31.     Rather, on September 14, 2023, Mr. Dolan and Luis Rojas represented that these were the investigation's findings and demanded that Mr. Nallasivan sign the written warning. During this conversation, Mr. Nallasivan learned that the allegations of the failure to collaborate referenced a 2022 CAS Audit (the same year that the audit was successfully closed, and he received extraordinary performance rating), not 2023 audit, and that the "dangerously close ethical violation" regarded an e-mail marketing campaign that was under Mr. Sakstrup's direct purview as CMO.

32.     Since Mr. Nallasivan was being blindsided and pressured to sign the documented written warning without having a chance to process and review it, he refused to sign the document. It was telling that the CAS audit which represented that Mr. Nallasivan failed to collaborate well with others was in 2022, especially given that his 2022 360 review with several leaders in the bank explicitly contradicted the allegations made against him. Moreover, it did not make sense for U.S. Bank to allege that Mr. Nallasivan failed to collaborate well with others given that he had generated over $150 million each year and had excellent relations with the business partners that he worked with. If he had not been collaborative and developed these relationships, he would not have been able to generate said revenue.

33.     The following day, Mr. Nallasivan requested that Mr. Rojas provide additional details and the facts upon which U.S. Bank justified the documented warning. Specifically, Mr. Nallasivan asked to be provided with evidence that he had presented false metrics, especially since he was not personally involved with providing any metrics with respect to the prospecting

campaign for marketing. Further, Mr. Nallasivan does not have access to Salesforce marketing cloud or datorama which was the tool to provide marketing metrics in the first place.

34. Mr. Nallasivan also pointed out that Mr. Sakstrup had informed him that the alleged conclusions of the investigation were "ridiculous," and that Mr. Sakstrup was not informed of any of these conclusions despite him being the operative and accountable leader responsible for the prospective campaign as Chief Marketing Officer, as well as Mr. Nallasivan's supervisor for the time period of these allegations. Mr. Sakstrup told Mr. Nallasivan that he had a single meeting with the investigators, and all of his statements directly contradicted U.S. Bank's assertions. Rather, Mr. Sakstrup disclosed that Mr. Nallasivan was a collaborative and effective leader, and that he saw no issue with Mr. Nallasivan's metrics after review. Finally, Mr. Nallasivan requested that he be provided with the documents which would show that he or his team were not being transparent and/or collaborative. Mr. Sakstrup was unable to provide any information that demonstrated that Mr. Nallasivan provided false data.

35. On September 18, 2023, Mr. Nallasivan requested that Mr. Rojas confirm that he interviewed the individuals that Mr. Nallasivan identified as experts directly involved in the decision-making process for prospecting campaigns and would be able to rebut these claims by U.S. Bank. Mr. Rojas never responded to this e-mail. Rather, Mr. Nallasivan has been informed confidentially that Mr. Rojas and/or the investigators never met with the list of individuals that could rebut U.S. Bank's assertions about Mr. Nallasivan; and that the investigators did not care if Mr. Nallasivan and/or the list of relevant individuals had any contradictory evidence. Indeed, the investigation failed to interview key subject matter experts, including but not limited to, individuals who had the ability to provide approvals in the Archer system, and/or who had actually provided the metrics in question. Mr. Rojas also refused to interview the individuals that Mr.

Nallasivan had provided and requested that Mr. Rojas and investigators interview. Mr. Rojas, in an unprofessional manner, stated during the call, 'he doesn't give a shit,' which reflects conduct unbecoming of a professional and said that system was designed to "protect the family" and could not engage in any further conversations with Mr. Nallasivan.

36.     Mr. Dolan and Mr. Rojas had the authority and discretion to apply the investigative policies for U.S. Bank and wholly failed to thoroughly investigate the allegations made against Mr. Nallasivan. They failed to review and conduct a subsequent investigation into the evidence provided by Mr. Nallasivan when he was finally informed of the allegations made against him. Had they done so, they would have no basis to issue any disciplinary actions against Mr. Nallasivan. Instead, they knew that the investigation was biased and conspired to get rid of Mr. Nallasivan for discriminatory and eventually retaliatory reasons.

37.     All of the individuals involved with the investigation, including Mr. Dolan and Mr. Rojas, were required to ensure that their business conduct were professional, truthful, accurate, and reflect U.S. Bank's ethical standards. Given the multiple points of failure throughout this process, it remains apparent that the investigators failed to conduct a fair, thorough, and unbiased investigation.

**Mr. Sakstrup contradicts all of the allegations in the written warning**

38.     The next day, Mr. Sakstrup had a conversation with Mr. Nallasivan regarding the documented warning and alleged investigation. Mr. Sakstrup disclosed that Mr. Rojas refused to allow him to be a part of the investigation, that he was surprised at the findings, and that the feedback that he provided to investigators was entirely different than the written warning. Rather, Mr. Sakstrup represented that in line with Mr. Nallasivan's prior performance reviews, he told Mr.

Dolan and Mr. Rojas that he believed that Mr. Nallasivan was always honest and never had concerns about Mr. Nallasivan's integrity or ethics.

39.    Mr. Sakstrup also disclosed that there were no issues with the metrics as Mr. Dolan and Mr. Rojas were attempting to portray. In fact, Mr. Sakstrup not only confirmed that the methodology devised by Mr.Nallasivan's group [EAA] for calculating the metrics was correct, and that he had sent an e-mail to the investigation team to confirm it. Mr. Sakstrup stated that he never heard anyone discuss that Mr. Nallasivan had a chilling effect due to his treatment of others, and represented that Mr. Nallasivan brought joy and happiness to the employees of U.S. Bank. Mr. Sakstrup ended the conversation by stating that the investigation was "ridiculous," and that Mr. Nallasivan was honest, a person of integrity and principle, and did what was best for the bank and its business partners.

**Mr. Nallasivan shares his concern that he is being targeted, discriminated against, harassed, and retaliated against because of his race.**

40.    Because Mr. Dolan and Mr. Rojas were unable to support any of their allegations, as well as the fact that the allegations directly contradicted with his several years of prior performance reviews, and Mr. Sakstrup's representations, Mr. Nallasivan shared his concern that he was being discriminated against due to his race, ethnicity, religion, and national origin given the highly unusual facts. Mr. Nallasivan also questioned why he was being written up for something within the Chief Marketing Officer's purview, as the ethics complaint centered around a marketing project, and Mr. Sakstrup was the Chief Marketing Officer in charge of the prospecting campaign and his team [marketing] was accountable for execution and providing metrics through salesforce marketing cloud. Mr. Rojas was unable to provide a response and asserted that "he couldn't expose the bank" and could provide no facts and/or evidence because he was not a part of the investigation.

41.     In all of Mr. Nallasivan's correspondences with Mr. Rojas, Mr. Rojas was deliberately vague and refused to answer the majority of Mr. Nallasivan's questions. He also refused to provide evidence so that Mr. Nallasivan could be adequately informed of the claims and evidence against him, and so that Mr. Nallasivan could be afforded an opportunity to defend himself.

42.     On September 21, 2023, Mr. Nallasivan renewed his requests that he be provided any evidence from the alleged investigation or additional details so he could respond to it, as Mr. Dolan and Mr. Rojas were continuing to harass Mr. Nallasivan to sign the written warning. At this meeting, Mr. Nallasivan brought ten pages of evidence to demonstrate that the allegations against him were unsubstantiated and stated that he was refusing to sign a document containing false narratives, especially with no opportunity to defend himself, only to be disregarded by Mr. Dolan and Mr. Rojas.

43.     With regard to U.S. Bank's allegation that he had come close to an ethical violation with regard to the Acxiom prospecting campaign, Mr. Nallasivan brought a list of **twenty-seven individuals** who had approved the prospecting campaign through multiple business change inventory, approvals of Chief Marketing Officer and Chief Risk Officer and that it made little sense to place the blame **solely** on him. Other White leaders who held significantly more direct responsibility for the accusations levied against Mr. Nallasivan were not subjected to written performance warnings or similarly targeted with discriminatory, harassing, and retaliatory attacks. Further, Consumer Lending, under the leadership of Ms. Ties and Mr. Wind, President of Lending, provided Risk / Prism approvals for the prospecting campaign in question, and had been deploying prospecting e-mails through Salesforce Marketing Cloud of the **preceding sixteen months and this campaign referenced in investigation was no different**. This was a crucial fact that was

either overlooked or consciously disregarded by the investigators. The list of individuals includes SME from various areas of the bank involved in the campaign approval process, demonstrating that this was not a singular decision made by Mr. Nallasivan, as alleged by Mr. Dolan and Mr. Rojas.

44.     All of the individuals identified by Mr. Nallasivan had been informed of the prospective campaign and conducted their own internal review. At no point did any of these individuals, including the employees in Legal, compliance teams, Risk (Business-Line), FARB, raise any issue planning, decisioning and execution of prospective campaign. Additionally, as program sponsor executives, Mr. Wind, President of Consumer Lending and Ms. Ties, SVP of Lending, Chief Marketing officer and Chief Risk Officer reviewed and signed off on all plans and details with detailed BCI and PRISM approval, and did not raise any concerns throughout every step of the process. Rather, all of the above parties provided their approval of the campaign. It was clear that while U.S. Bank was attempting to depict Mr. Nallasivan as a rogue employee with regard to the prospecting campaign, nothing could be further from the truth.

45.     On September 22, 2023, Mr. Dolan confirmed that the investigation was closed and that the written warning document did not need to be signed. Telling, Mr. Dolan only confirmed that the written warning did not need to be signed after Mr. Nallasivan indicated that he was considering retaining an attorney, or to have a witness to the conversations. Mr. Dolan explicitly stated that U.S. Bank would be moving forward with business as usual, even without Mr. Nallasivan's signature. However, later that day, Mr. Rojas spoke with Mr. Nallasivan and stated that Mr. Nallasivan was unaware of what is happening to "your boss on the other end."

46.     On October 2, 2023, Mr. Rojas also informed Mr. Nallasivan that the investigation was closed, and the complaint would be placed in Mr. Nallasivan's personnel file. This

demonstrates that Mr. Rojas had no intention of conducting an investigation into the numerous evidence that Mr. Nallasivan provided to show that the complaint against him was unsubstantiated and was premised on discriminatory, harassing, and retaliatory grounds. Mr. Rojas directed Mr. Nallasivan to move on and refused to set up further meetings with CHRO, Mr. Barcelos, after Mr. Nallasivan's explicit request.

47.     On October 6, 2023, Mr. Nallasivan informed Mr. Dolan that he was not comfortable with a baseless complaint being placed in his personnel file and wanted the addition of language which would make it clear that the case had no merits. Mr. Dolan stated that he would check with legal and get back to Mr. Nallasivan. He never did. Given that Mr. Dolan had previously represented that no further action would be taken against Mr. Nallasivan (including his prior representations that Mr. Nallasivan was "very results-driven, had lot of positive qualities and [Mr. Dolan] had received outstanding feedback from Gunjan and several other management committee members", and assurance that Mr. Nallasivan had a "great future in the organization", Mr. Nallasivan attempted to put this incident behind him, as Mr. Dolan and Mr. Rojas made it clear that they would not take any further attempts to look into whether the complaints made against Mr. Nallasivan were discriminatory and/or incorrect.

**U.S. Bank begins to install a White man and a White woman in Mr. Nallasivan's position**

48.     In November 2023, Mr. Nallasivan was contacted by a friend that interviewed for a role at U.S. Bank. His friend was informed by a Vice Chairman that Dominic Venturo, a white man, was going to be taking over the role / team of Chief of Artificial Intelligence at U.S. Bank and proposal was with the CEO. A PwC partner also made the same representation to Mr. Nallasivan shortly thereafter and asked if he was planning to leave to another bank if Dominic would be taking over the AI function. This was extremely confusing to Mr. Nallasivan as he had

been the Chief of Artificial Intelligence since 2019, and his team had developed multiple artificial intelligence models into production since 2019.

49.     In fact, one of Mr. Nallasivan's artificial intelligence deployments resulted in a savings of approximately $50 million for the company in loss avoidance in 2023. Mr. Kotwal, one of U.S. Bank's Vice Chairs running payments, and the key Management Committee sponsor for this work effort specifically complimented Mr. Nallasivan for his and his team's efforts, and acknowledged the partnership and collaboration that Mr. Nallasivan had displayed through his efforts.

50.     Mr. Venturo's team, on the other hand, had not developed a single model in production which has been confirmed by Mr. Venturo's own team that "they never implemented any models in production". In comparison, Mr. Nallasivan had approximately 350 people working on analytics and artificial intelligence initiatives, delivered 70+ AI models in production, with significant directly attributable business revenue for all business-lines (including research, in-house development and deployment of models, 3rd party solutions, and integration with U.S. Bank Model Risk Governance, and Technology and Operations Services teams) while Mr. Venturo had approximately nine individuals focused on AI research. Mr. Venturo had also previously in a written communication asking whether "machine learning" meant that that the machine learned from itself. It was clear that Mr. Venturo did not have the requisite experience that Mr. Nallasivan had. Despite this, Mr. Venturo would continue to represent that "he owned AI" at U.S. Bank and that he told Mr. Nallasivan on a call that he was the only one authorized to speak about AI to the board.

51.     To make matters worse, Mr. Venturo has been misrepresenting Mr. Nallasivan's work in the AI-sphere as his own. In connection with building up Mr. Venturo's profile to replace

Mr. Nallasivan, U.S. Bank has also made representations to external Media that Mr. Venturo is U.S. Bank's Chief AI Officer, while Mr. Nallasivan was still in the role. U.S. Bank is aware of the fact that Mr. Venturo is attempting to pass off Mr. Nallasivan's work as his own, but U.S. Bank has refused to make any attempts to correct this false narrative, and instead has elevated Mr. Venturo. Once again, this demonstrates the discrimination that Mr. Nallasivan was subjected to.

52.     It remains clear that these discriminatory actions were intended by U.S Bank to replace Mr. Nallasivan, a person of color, and allocate his responsibilities in favor of Mr. Dominic Venturo (a White male) and Ms. Kate Whittington (a White female) with little experience and work product in the AI-sphere and analytics domain.

53.     Ms. Kate Whittington's former Customer Experience team was primarily focused on working with external customer research agencies and firms and relied heavily on Mr. Nallasivan's leadership and team for accessing, sourcing, using, and delivering internal data driven analytics and insights. Ms. Whittington's team used EAA as "analytics experts" to augment the primarily external research insights that her team sourced from external vendors. During Mr. Nallasivan's numerous interactions with Ms. Whittington and her team, they made it amply clear that it was only due to Mr. Nallasivan's work and collaborative effort that they were able to gain insight into internal data driven customer insights. Additionally, as recent as Feb 2024, in the context of the organizational shifts, Mr. Lacorazza admitted to Mr. Nallasivan that Ms. Whittington was not qualified for analytics role and did not have the requisite experience that Mr. Nallasivan has, including a statement which asserted that he was aware that the "analytics side is not her strength or her visibility." Mr. Lacorazza also represented that Ms. Whittington had very little experience in running analytics in financial services. Ms. Whittington's primary background is in the retail sector, which involves significantly less complex and intricate data.

54.     Mr. Lacorazza even admitted that Vice Chairs believed that Ms. Whittington was not qualified per se for the role, yet U.S. Bank decided to allow a less than qualified White woman to take a significant portion of Mr. Nallasivan's role. In a subsequent conversation as Mr. Nallasivan was transitioning out of his role, Ms. Whittington in a candid moment expressed her belief that this transition would be a "disaster" because the U.S. Bank employees and PwC employees in charge of the transition had no idea how to ensure continuity and lacked a basic understanding as to what Mr. Nallasivan's team did at U.S. Bank. This demonstrates that Ms. Whittington had valid concerns about her ability to step into Mr. Nallasivan's role, and knew that the transition was not well thought out. Ms. Whittington also acknowledged that it appeared to her that *Mr. Venturo was attempting to "scoop" Mr. Nallasivan's work product however he wanted to and succeed at U.S. Bank, and that the transition was not "well thought out."*

## U.S. Bank continues its campaign of discrimination, harassment, and retaliation against Mr. Nallasivan

55.     Despite numerous explicit assurances by Mr. Dolan and Mr. Rojas that Mr. Lacorazza would not be informed of the investigation into Mr. Nallasivan, Mr. Lacorazza was informed of all of the details of the investigation. In Mr. Nallasivan's 2023 year end performance, Mr. Dolan referenced the closed investigation and stated that while Mr. Nallasivan's ratings would be meaningful, the fact of the matter was that he was going to receive a lower score and deficient rating in the risk incentive score card with incentive clawback because of the allegation that he could not collaborate with others (something that is clearly contradicted by Mr. Dolan's feedback on  October 6, 2023, 5 years of non-discriminatory and non-retaliatory performance reviews that he received as well as Chief Risk Officer). U.S. Bank's Chief Risk Officer later informed Mr. Nallasivan that the Risk Incentive Scorecard would be sent to Office of the Comptroller of the Currency (OCC), despite Mr. Dolan making no mention of that. Mr. Dolan was well aware that

Mr. Nallasivan worked closely with OCC throughout his career, and that this would have a permanent negative effect on Mr. Nallasivan's reputation.

56.     Once again, Mr. Nallasivan expressed his surprise given that in 2023, he and his team had delivered 5x the target goal, that he and his team were extremely collaborative on all of their projects, and that they had worked long hours and weekends on their various critical and time sensitive projects including complex Union Bank Conversion (such as real time balance reporting to OCC, fixing every business banking customer data manually and retaining several billion dollars of Union Bank balances which were at risk of attriting US bank) with accolades from several Vice Chairman's across the enterprise. Mr. Dolan refused to change the ratings and refused to listen to Mr. Nallasivan's pushback, just as he did in the prior months. It was clear that Mr. Dolan intended to discriminate against and retaliate against Mr. Nallasivan to remove him from U.S. Bank's employment to install Mr. Venturo.

57.     The Risk Incentive Scorecard with deficient conduct risk filed in November 2023 was premised on a false and discriminatory narrative that Mr. Nallasivan had a conduct warning regarding his approach "with select other employees." Providing any details of alleged infraction would be minimum standard and any risk issue from conduct would be addressed when it was identified and not as a part of the annual review. Although the scorecard acknowledged that there was "no indication of the behavior continuing" it still provided Mr. Nallasivan with a negative score with incentive clawback. When one reads further into the scorecard, it acknowledges that there was "no matter substantiated related to violations of ethics or code of conduct." This acknowledges that Mr. Nallasivan's position — that he was innocent of the allegations made against him — was warranted. Mr. Dolan essentially weaponized and misused a federal OCC risk management process and procedures including effective oversight by the board of directors,

Corporate Risk and HR to target and pursue a pattern of malicious and targeted attacks on Mr. Nallasivan. U.S. Bank's Chief Risk Officer with oversight on the Risk Incentive scorecard, Mr. Spiller, later shared his belief that the investigation was "bogus."

58.     The scorecard attempted to portray Mr. Nallasivan as "defensive" or combative without painting the full picture. Mr. Nallasivan was "defensive" against false allegations and Mr. Dolan and Mr. Rojas continually refused to provide an iota of evidence against him, and refused to investigate Mr. Nallasivan's claims that these claims were false and discriminatory. It was clear that this negative rating and its assertions about Mr. Nallasivan being "defensive" were continued attempts of discrimination and retaliation for Mr. Nallasivan's claims that he was being discriminated against. *At the end of the day, no claims were substantiated against Mr. Nallasivan, no attempts were made to investigate his rebuttals and claims that the allegations were discriminatory, yet U.S. Bank still attempted to put forward a negative risk assessment.*

59.     U.S. Bank submitted the negative risk assessment intentionally, in order to claw back compensation provided to Mr. Nallasivan, as well as to damage his future employment opportunities as U.S. Bank is aware that this will hinder Mr. Nallasivan's employment in the financial services industry.

60.     Mr. Nallasivan's suspicions were confirmed when Mr. Lacorazza stated on December 13, 2023, that "there were forces that want you out of here." In order to protect his employment from the discrimination, harassment, and retaliation he was subjected to, Mr. Nallasivan reached out to senior leaders at U.S. Bank to ask for their feedback on his collaboration efforts.

61.     Throughout December 2023, a number of senior leaders worked together to collect an unbiased and fair assessment of Mr. Nallasivan. An Executive Vice President met with a Vice

Chairman multiple times and discussed the fact that Mr. Nallasivan was being treated poorly and "these concerns need to be escalated to highest level and he was following the hierarchy chain". The Executive Vice President stated that he would be happy to speak to U.S. Bank's Chief Executive Officer, Mr. Cecere if the Vice Chairman was unwilling. In response, the Executive Vice President informed Mr. Nallasivan that there was "rot at the top and we are about to find how widespread the rot has gone" and that he was "cycling between shock and anger" in the way that this unfolded.

62.    Jill Ties, a Senior Vice President in Consumer Lending Market Strategy, 40 year veteran of the bank and primary business line sponsor for the prospecting campaign where the alleged infractions occurred, also informed Mr. Nallasivan that there was full and total compliance with all business-line risk and decision processes, and that she never had an issue collaborating with Mr. Nallasivan and that he had "grace, integrity, and ethical standards" that could serve as a role model for anyone. In essence, she rejected all of the allegations made against Mr. Nallasivan. It was clear that any allegation that Mr. Nallasivan was hostile, aggressive, or refused to collaborate was false. She also expressed a belief that Mr. Dolan was aware that there were no facts to support his claimed investigation.

63.    On December 13, 2023, Mr. Lacorazza informed Mr. Nallasivan that he intended to provide Mr. Nallasivan a rating of "exceeds expectations" for 2023 especially given the glowing feedback and "exceeds" rating that Mr. Sakstrup as interim Chief Marketing Officer provided Mr. Nallasivan and given the fact that Mr. Lacorazza had limited interactions with Mr. Nallasivan for the majority of the year. However, Mr. Lacorazza expressed that Mr. Dolan had over-ridden his decision and intentionally changed the rating to a lower one, and added the investigation /

scorecard comments. Mr. Lacorazza disclaimed any wrongdoing and stated that he was just the messenger. Once again, this demonstrates the discriminatory and retaliatory efforts by Mr. Dolan.

64. Later that day, Mr. Dolan and Mr. Lacorazza met with Mr. Nallasivan to discuss his 2023 review. Mr. Dolan, once again, relied on the biased and targeted investigation that was intended to discriminate against Mr. Nallasivan. Mr. Dolan falsely represented that Mr. Nallasivan caused risk for the company, despite being unable to provide an iota of evidence (and the OCC incentive scorecard stating otherwise). He refused to address Mr. Nallasivan's points that 2023 was a largely successful year, with $260 million in deliverables to the company, which was five times the target goal. Mr. Dolan refused to change the score.

## Mr. Spiller, the Chief Risk Officer, acknowledges that Mr. Dolan's investigation was "bogus" and is surprised

65. Mr. Nallasivan also referenced that he had glowing reviews from all of his business partners, and could provide further feedback to demonstrate that the investigation was premised on false facts. Mr. Dolan stated he did not want to hear anything further. At that time, given that he was arguing with an individual who had a pre-determined goal, Mr. Nallasivan stated that he would have filed an ethics investigation into this matter in October 2023, if he had known that this case had not been closed and the falsified investigation was intended to discriminate/retaliate against him (especially given the OCC Scorecard). On December 15, 2023, Mr. Nallasivan spoke with Dan Spiller, the Chief Risk Officer. Mr. Spiller runs risk for all administrative functions for Mr. Dolan and had been with the company for over two decades. Mr. Spiller was sympathetic and explicitly asserted that:

> "I understand that and in some ways I really appreciate it because I've been, I've sat exactly where you are in fact and I believe it was a bogus investigation and I.. I totally get that…"

66.     Mr. Spiller acknowledged that prospecting campaigns have numerous individuals who are risk checkers, many people on the risk team and that it was fundamentally unfair to place the blame solely on Mr. Nallasivan.

67.     Mr. Spiller also acknowledged that while he had heard concerns about collaboration issues regarding Mr. Nallasivan and his team. His investigation revealed the opposite. He found that Mr. Nallasivan and his team had worked collaboratively over the years, and that these accusations directly contradict his working relationship with Mr. Nallasivan. Mr. Spiller explicitly stated that he found Mr. Nallasivan easy to work with, which corroborated the numerous performance reviews by Mr. Sakstrup and various business partners praising Mr. Nallasivan for his collaborative nature. He stated that he was very much struggling as the feedback that he had heard about Mr. Nallasivan from Vice Chairs directly such as Shailesh, Tim and Gunjan (although not directly) and Mr. Lacorazza were "off the charts".

68.     Mr. Nallasivan would later come to learn that two white individuals ended up replacing him. In fact, Mr. Spiller characterized the investigation as a "crazy audit" and that U.S. Bank's Chief Executive Officer could state that it was a "crazy audit."

69.     Mr. Spiller disclosed that similar accusations had occurred in the past, and that the alleged investigation had been utilized as a weapon of discrimination and retaliation in the past. Unfortunately, it has its intended effect and individuals who push back on *"finding truth"* are removed from the company. Mr. Spiller also asserted that this investigation was not done by CAS, and that he could guarantee it. He also stated that the audit was a "crazy audit" and not even the CEO could represent that it was a fair audit. Mr. Spiller concluded the conversation by stating that he had an excellent relationship with Mr. Nallasivan and that he would reach out to Chief Ethics Officer, Mr. Dolan and Mr. Lacorazza to see if he could do anything to fix the risk incentive

scorecard. *He also stated his appreciation that Mr. Nallasivan continued to discover the truth, as he had "been there" before.* Mr. Spiller shared a story that he knew of other employees had gone through the same and/or similar accusations and they had been terminated after their attempts to demonstrate the accusations were baseless. Mr. Spiller also stated that HR was not the strongest area in the company.

70.    On January 5, 2024, Mr. Spiller stated that he spoke with Mr. Dolan and Mr. Lacorazza to see if the narrative on OCC risk incentive score card can be removed but nothing could be done at this stage. Mr. Spiller also informed Mr. Nallasivan that he reached out to the ethics office, but heard a similar response. Mr. Spiller encouraged Mr. Nallasivan to put this matter behind him, despite the fact that the investigation was intended to discriminate against Mr. Nallasivan.

**U.S. Bank actively deleted positive feedback of Mr. Nallasivan to suppress positive facts**

71.    As Mr. Nallasivan reached out to several management committee members asking for feedback on his 2023 performance, U.S. Bank continued its campaign of discrimination, harassment, and retaliation. On January 9, 2024, Arjit Roy (Senior EVP of Consumer and Business Banking Organization and Management Committee member) informed Mr. Nallasivan that he had been directed by human resources *not to provide feedback* for Mr. Nallasivan in Workday, U.S Bank HR system of record. This was not surprising to Mr. Nallasivan as another senior female executive disclosed that the positive feedback that she left for Mr. Nallasivan in Workday had *"disappeared."* Mr. Roy also stated that human resources had told him that Mr. Nallasivan was traveling in India and he was not reachable, and he was told by HR that Mr. Wind had also declined a request for feedback for Mr. Nallasivan (Mr. Nallasivan never solicited feedback from Mr. Wind, and contrary to HR's claims, Mr. Nallasivan was not traveling at the time. These inaccuracies

appear to have been deliberately used by HR to prevent senior leaders from providing positive feedback on Mr. Nallasivan.). Mr. Nallasivan immediately informed Mr. Spiller. Additionally, Ms. Shruti Patel (EVP, Chief Product Officer, CBB) informed Mr. Nallasivan that she was also informed to *not provide any feedback* to Mr. Nallasivan, and that she "was shaking" and believed it had a "chilling effect" on her. Despite outreach efforts by Mr. Nallasivan to six senior leaders and heads of businesses—including Vice Chairs for feedback—no feedback was submitted. This only further demonstrates the hostile work environment fostered by U.S. Bank and **Mr. Nallasivan also explained this to Vice Chair as how "the most ethical" bank was engaging in unethical practices behind the scenes as a part of retaliation.** Senior leaders confirmed that Mr. Rojas and Mr. Todd Sherman (EVP, Chief HR officer, CBB) instructed them not to provide valid positive feedback on Mr. Nallasivan, and that they were shocked and angered in the way Mr. Nallasivan had been treated and a senior leader commented that "this place runs like a mafia and they think we don't talk to each other". This was also reported to U.S. Bank.

72.     During this time period, multiple senior leaders reached out privately to Mr. Nallasivan to communicate their support and expressed their belief that Mr. Nallasivan was being subjected to a false and retaliatory investigation. Other leaders commented on how they were aware that Mr. Rojas was considered to be "unethical" by his peers in human resources, and how the investigation was "simply shameful." *One of the senior leaders stated "can you even imagine when some of Luis unethical / threatening transcripts come out? Or TD outright lying?"* As a result of U.S. Bank's discrimination, harassment, and retaliation, Mr. Nallasivan has been informed that numerous complaints had been filed with regard to U.S. Bank's investigation and subsequent treatment of Mr. Nallasivan.

**U.S. Bank discriminates and retaliates against Mr. Nallasivan and "eliminates" his position**

73.     On January 30, 2024, Mr. Nallasivan was informed by Mr. Lacorazza that his role had been eliminated and that his group would be split into three to four separate groups. In order to aid the transition, Mr. Lacorazza informed Mr. Nallasivan that he should expect a nice package which would "not disappoint" Mr. Nallasivan. Mr. Lacorazza also expressed his desire that Mr. Nallasivan aid in the transition work over the next few months, to help identify the talent on his team. Mr. Lacorazza, in a Teams message, agreed that Mr. Nallasivan's last date of work would be in May 2024, and that U.S. Bank would agree to pay the 2023 Long Term Incentive (LTI) in excess of $100,000 (a specific amount was stated) in cash if Mr. Nallasivan agreed to perform this work. Given that this representation was memorialized in writing by Mr. Lacorazza, Mr. Nallasivan relied on this representation and agreed.

74.     Mr. Nallasivan performed all the agreed upon transition work and in addition, spent many hours with Mr. Lacorazza on designing the future organization.

75.     Defendants never paid Mr. Nallasivan the promised wages.

76.     Mr. Rojas later informed Mr. Nallasivan that his role would be eliminated due to the size and scope of the new team. *Mr. Rojas directed Mr. Nallasivan to lie to his colleagues and to state that he was leaving the firm for external opportunities, because "it would raise a lot of eyebrows internally and externally".* The emphasis on intentionally misleading and falsifying material facts "externally" demonstrates that they were aware that external stakeholders especially in Federal and or other regulatory roles would find this very unusual and possibly connected to illegal acts as Mr. Nallasivan's team closely worked with Chief Model risk officer and passed every OCC exam for his group. This is yet another direct evidence that HR intended to falsify

information intended for external regulatory consumption. This direction did not come with any offer with aid for searching for a new position.

77. On February 1, 2024, given his prior business relationship with Andy Cecere, the Chief Executive Officer, Mr. Nallasivan thanked Mr. Cecere for the opportunity and expressed his interest in staying in touch. Mr. Nallasivan also requested a brief thirty-minute meeting with Mr. Cecere, if his schedule permitted and Mr. Cecere agreed.

78. Shortly thereafter, Mr. Rojas angrily called Mr. Nallasivan and threatened Mr. Nallasivan with "consequences" if Mr. Nallasivan did not cease his attempts to inform others that he had been laid off. Mr. Rojas proceeded to instruct Mr. Nallasivan to lie about his termination, and to state "I don't know what you are talking about, it is not true." It was clear that Mr. Rojas was attempting to keep Mr. Nallasivan's termination from becoming known at U.S. Bank, in an effort to hide the discriminatory and retaliatory termination.

79. The next day, Mr. Spiller texted Mr. Nallasivan and apologized for his termination, and acknowledged that it must be difficult given Mr. Nallasivan's significant contributions over the years.

80. On January 31, 2024, Mr. Rojas stated to Mr. Nallasivan over the termination call "*So for that for that consideration of you helping us transition the teams there there's there is.. there's a monetary value attached to that. We need your help right. There isn't that level of detail of understanding your team around the talent right... And that's where we need you to partner with us to do the line by line. To understand what is it that they're doing? Is it marketing? Is it AI? Is it ML? Is it enterprise analytics? Is it reporting? Like what is it? Because we don't.... And that's why we want to keep this confidential as much as possible.*" On February 5, 2024, Mr.,Lacorazza reached out to Mr. Nallasivan and stated "*You uniquely understand the talent, the capabilities,*

*scopes [sic] of work, how the work gets done, dependencies, etc. so your engagement on this effort is critical.",* and for NBA program in Marketing he added *"Your help in enabling this to succeed is important",* and for Marketing Measurement he said *"Help the team get this right".* This demonstrates that Mr. Lacorazza and Mr. Rojas was specifically aware of Mr. Nallasivan's expertise and trusted / respected his insights despite the fact that U.S. Bank had determined that Mr. Nallasivan was no longer a "necessary" employee and terminated his employment. On February 6, 2024, Mr. Lacorazza met with Mr. Nallasivan and informed him that he needed help with the organizational structure for a future team as Mr. Nallasivan's role was too technical and very much analytical in nature and he doesn't have any resources on his team to do his role. At this time, Mr. Nallasivan learned that his role had not been eliminated. Rather, U.S. Bank eliminated Mr. Nallasivan and was "creating" a role for a customer experience and analytics team with an anticipated group of ~381 people. Mr. Lacorazza mentioned to the team that he was going to reinvest in talent and capabilities for the team and would be posting roles in the coming days. Previously, both Mr. Lacorazza and Mr. Rojas represented that Mr. Nallasivan's role had been eliminated because the team was too small for him to run. This made no sense as the proposed team was even larger than Mr. Nallasivan's team. Additionally, Mr. Nallasivan's team already had a customer experience team and analytics team, further demonstrating that this was a process to remove Mr. Nallasivan from U.S. Bank and was not intended to be any meaningful restructuring.

81.    These discussions proceeded through February 13, 2024. Throughout this process, Mr. Lacorazza continued to ask Mr. Nallasivan for his recommendations on how to structure the overall team, because it was intended to essentially replicate Mr. Nallasivan's current team. To meet Mr. Lacorazza's continued request for assistance, Mr. Nallasivan provided significant inputs and feedback to ensure that critical SMEs were not mistakenly added to the "lay off" list, and

helped modify the list to ensure that key talent would not be adversely impacted and spent many hours helping him with the organizational structure recommendation, and data strategy (areas where Mr. Lacorazza did not have a background in).

82.     Later that day after conclusion of the "talent transition exercise", however, Mr. Rojas called Mr. Nallasivan to inform him that his exit-date would be mid-March and that U.S. Bank was refusing to pay the previously promised six-figure LTI pay-out. This was a classic bait-and-switch, especially after Mr. Nallasivan reasonably relied on this assertion. Mr. Nallasivan reached out to Mr. Lacorazza as this was completely misleading, Lacorazza admitted to Mr. Nallasivan on a call by saying that *"well.....I was relying on what he (Luis) was saying it was approved, I think, maybe he didn't understand the process or how this was supposed to work".* With Mr. Lacorazza saying that Mr. Rojas "didn't understand how the process or how this was supposed to work", it is clear that Mr. Rojas as the Chief HR leader of Mr. Dolan's organization intended to mislead both Mr. Nallasivan with an intent to defraud, and later mislead Mr. Lacorazza with an intent to discredit the latter's previous commitment to Mr. Nallasivan.

83.     Despite being informed of his discriminatory and retaliatory termination and U.S. Bank's refusal to honor its commitment to paying the LTI out, Mr. Nallasivan remained a loyal and hard-working employee,  including proactively raising risk issues alerting Mr. Lacorazza to possible risk of MRA as there were so many production AI models (such as fraud scoring) that Mr. Lacorazza had no idea about nor understood the function of model risk management / has never met the model risk officer after 6 months in his role with direct accountability for marketing and analytics functions in the company. However, Mr. Nallasivan being very loyal to the bank, he continuously met with and strategized with Mr. Lacorazza regarding the "new" department that was created to replace Mr. Nallasivan's. Mr. Lacorazza admitted in these conversations that U.S.

Bank erred in pushing Mr. Nallasivan out on an expedited schedule. Mr. Lacorazza admitted that

he still lacked the knowledge of what Mr. Nallasivan team's responsibilities were, and that he had

not reached out to any of the model risk partners to discuss the changes that were being made. This

was a significant concern because there was a lack of ability to support business continuity and

would result in a disruption of U.S. Bank's ability to provide services to business units and millions

of customers.

84. Mr. Lacorazza also stated that the proposed White replacements lacked the

experience and/or qualifications to succeed in the role. Mr. Lacorazza also admitted that it was

difficult to find someone with the technical experience of Mr. Nallasivan, even though Mr. Venturo

was advertising that he was the Head of AI at U.S. Bank.

85. In fact, Mr. Lacorazza admitted that Kate Whittington was not the right leader to

replace Mr. Nallasivan (once again demonstrating that this was a termination styled as a layoff to

force Mr. Nallasivan out of U.S. Bank. With regard to Ms. Whittington, Mr. Lacorazza raised

significant concerns about her lack of experience in analytics (which he represented in multiple

conversations – and Mr. Lacorazza is Ms. Whittington's supervisor), and that she was not the right

leader. Although Mr. Lacorazza concluded the conversation by asserting that he would not be

providing Ms. Whittington with the role, and requested that Mr. Nallasivan analyze who would be

a more suitable replacement. Despite this on March 14, 2024, Mr. Nallasivan was informed by

unhappy employees that Ms. Whittington had been appointed to the role despite significant

concerns raised by Mr. Lacorazza. Both Mr. Lacorazza and Ms. Whittington told Mr. Nallasivan

in separate conversations during this time that Mr. Venturo was engaged in "land grab" of AI team

and platforms from EAA. In prior conversations, Mr. Lacorazza acknowledged that these two

white employees were involved in the decision to remove Mr. Nallasivan so that they could be

rewarded with his position as Ms. Whittington needed a new role, and Mr. Venturo was trying to steal AI function from Mr. Nallasivan.

86.     In fact, Mr. Lacorazza acknowledged that Mr. Nallasivan's role was "technical" and that no candidate that was being proposed had the required skills to fulfill Mr. Nallasivan's shoes.

87.     The most significant concern that Mr. Nallasivan had during these conversations is the fact that Nallasivan and team have deployed hundreds of artificial intelligence models and someone at U.S. Bank would have to be responsible for these projects and responsible for ensuring compliance with and liaising with state and federal regulators. Despite Mr. Venturo's representations that he was the Head of AI, he had deployed very few, if any, artificial intelligence models and was still representing Mr. Nallasivan's work as his own.

88.     Mr. Lacorazza has continued to contact Mr. Nallasivan to discuss individuals who would be suited to fill the roles that were open. This further demonstrates that Mr. Dolan was responsible for making a reckless organizational change, on an expedited schedule and his vested interest, to get a high-performer like Mr. Nallasivan ousted from U.S. Bank, without a proper plan to ensure that U.S. Bank continues to experience the exponential growth that Mr. Nallasivan was directly responsible for. Mr. Lacorazza expressed that he was unaware of who the validation model partners are, how model risk governance works, several exams that the group had gone through with OCC and how artificial intelligence models are validated in production. On Feb 27th, 2024, Chief Model Risk officer was shocked about Mr. Nallasivan's departure and informed Mr. Nallasivan that he was never informed of any organizational changes that Mr. Lacorazza / Mr. Dominic was intending to do and was very worried that Lacorazza's changes had significant impact on model risk governance for the enterprise as OCC had completed ~40 model exams with

him just last year. These are key processes and strengthened Mr. Nallasivan's belief that his lay-off was discriminatory and retaliatory and warned Mr. Lacorazza again of potential MRA.

89.     After these conversations about the risk of MRA, Mr. Lacorazza hurriedly called one of Mr. Nallasivan's direct reports (head of data science) and informed him that Mr. Nallasivan was leaving the company. Mr. Lacorazza demanded that he inform him whether he and his team would be willing to move under Mr. Venturo (the individual who had plagiarized Mr. Nallasivan's work over the years), and / or participate in the organizational restructuring meetings on his team.

90.     In line with this assertion, Mr. Lacorazza proceeded to send the Head of Data Science, under Mr. Nallasivan, a deck that was "created" by Mr. Venturo. The Head of Data Science who has been with company over 25 years and having worked with Mr. Nallasivan for last several years, quickly recognized that Mr. Venturo had plagiarized Mr. Nallasivan's work and was passing it off as his own, even though this was work that Mr. Nallasivan had been doing for U.S. Bank since 2018. He stated that *"it was tough to find anything new in it, just retitle and be done"* Mr. Venturo was allowed to get away with this because of the protections he was provided by Mr. Dolan.

91.     In further discussions with other senior leaders, Mr. Nallasivan has heard similar beliefs that his termination has deviated from the sound governance and decision processes that U.S. Bank had previously implemented. These senior leaders have called Mr. Nallasivan and have expressed their shock and dismay of his termination including VC members. It is clear that any allegation that he was not collaborative, or was not an effective employee of U.S. Bank are wholly false.

**Numerous issues arise with Ms. Whittington and Mr. Venturo**

92.     Ms. Whittington's performance concerns are well documented among her subordinates and team. These employees acknowledged that Ms. Whittington retaliates against employees and that she was a poor leader who was more interested in promotion than the bank or colleagues.

93.     On February 2, 2024, Ms. Whittington acknowledged that the reorganization and strategy plan was a "disaster", and that Mr. Lacorazza and Mr. Dolan had not thought the process through. Ms. Whittington commented that she believed that the PwC partner had no idea what they were doing, and that decisions that were being made about Mr. Nallasivan's team were incorrect. Additionally, Ms. Whittington and Ms. Stellmacher, who was Chief of Staff for Mr. Dolan, disclosed that she believed that Mr. Lacorazza was getting a little bamboozled and Mr. Venturo was making a power grab by taking the position away from Mr. Nallasivan.

94.     With regard to Mr. Venturo, senior leaders have become increasingly concerned with Mr. Venturo's attempts (which have been supported by U.S. Bank), for intentional misrepresentation regarding his work, his "*shameless plagiarism*" of Mr. Nallasivan's work, and Mr. Venturo's attempts to claim that he was responsible for the work that Mr. Nallasivan and his team had completed over last several years. These concerns from senior leaders have been echoed by Chief Product Officers, engineers, and Mr. Venturo's own team.

95.     Mr. Venturo even used U.S. Bank's Media Relation team to stop the release of an interview that Mr. Nallasivan had done with a media publication. In turn, Mr. Venturo directed U.S. Bank's Media Relation team to attribute Mr. Nallasivan's interview to himself. During innovation week in late 2023, Mr. Venturo's team showcased Mr. Nallasivan's work to the firm's

Chief Executive officer as "their own work", thereby showcasing a pattern of plagiarism internally and externally within the bank.

### U.S. Bank demonstrates its discriminatory and retaliatory intent and refuses to offer Mr. Nallasivan the opportunity to interview for suitable positions

96.     As Mr. Nallasivan has been informed by senior leaders, including Vice Chairmans and executive vice presidents, there were other opportunities available within U.S. Bank that were perfectly suited for Mr. Nallasivan's experience. For example, U.S. Bank had plans to open up a senior role in Data Strategy for which Mr. Nallasivan was more than qualified for and been assisting Mr. Dolan in creating for over a year. Not only did Mr. Nallasivan have years of experience in data strategy and the industry from his prior employment, Mr. Nallasivan also had years of experience collaborating with business line leaders (including Mr. Dolan) with regards to several challenges on U.S. Bank's $100 million+ investment into an analytics platform (UDAIP) which was built by technology (where he had voiced this concern multiple times to Mr. Dolan when he was the CFO and Mr. Sakstrup as Chief Strategy Officer as a diligent shareholder of the company), and other related data issues. These business line leaders complimented Mr. Nallasivan for his expertise, and much of the analytics and AI success was due to Mr. Nallasivan's and his team's contributions to these projects. Moreover, if Mr. Nallasivan had not built his own state of art analytics platform for U.S. Bank four years ago within his team, there would not be any artificial intelligence use cases completed at U.S. Bank. Michael Lacorazza admitted to Mr. Nallasivan that Dominic was "*taking away everything from him..., yeah I would say Dominic's play was pretty brilliant, you know on your platforms, well I mean its very interesting*". …. Michael stated again on a recorded call last week of February 2024 … "*he [Dominic] is already taking a play for the (AI) platforms….oh he did this…this and this….look what Gareth does….He totally wants it all….*" (for context, Gareth is a direct report to Dominic).

97.     This further demonstrates the valuable contributions that his collaborative nature has produced. In fact, these senior leaders commented that Mr. Nallasivan should have been given an opportunity to at least interview for these open roles, and that it was extremely strange that he was not provided with any of these opportunities.

98.     On April 3, 2024, U.S. Bank posted an opening for its Chief ML / AI Officer role, with an opening in Charlotte, North Carolina. The job function and responsibilities, skills profile, and preferred qualifications and skills are a perfect match for Mr. Nallasivan's work experience and skills. Despite this, Mr. Nallasivan was never considered for the role, even though he has been a leader in the ML / AI sphere for the past 20 years, serving on several AI advisory boards with glowing performance ratings. This only further demonstrates that his "lay-off" was done for purely discriminatory and retaliatory reasons.

99.     Additionally, at the end of March 2024, U.S. Bank posted an opening for the Head of Enterprise Business Unit Analytics and Customer Experience. Once again, the job function and responsibilities, skills profile, and preferred qualifications and skills are a perfect match for Mr. Nallasivan's work experience and skills. Mr. Nallasivan was informed and believes that this role was posted solely so that U.S. Bank could claim that it was a fair and impartial process, but U.S. Bank already knew who it was going to hire for that role. Once again, this is further evidence that Mr. Nallasivan's "lay-off" was done on discriminatory and retaliatory grounds, as numerous leaders have informed him that he should have been given an opportunity to interview for these roles, and that he was the most qualified individual for these roles.

**Further complaints against Mr. Lacorazza, Mr. Venturo, and Ms. Whittington**

100.    After Mr. Nallasivan's was terminated by U.S. Bank, employees have reached out to inform him that numerous ethics complaints were filed against Mr. Lacorazza, Mr. Venturo, and Ms. Whittington.

101.    In fact, these complaints explicitly reference that Mr. Lacorazza and Ms. Whittington are discriminating against and harassing other employees of color, especially those on the newly-formed analytics team. In a subsequent townhall meeting, numerous questions focused around the lack of diversity on the newly-formed teams.

102.    Several people of Indian origin were pushed out of the bank, demoted from their current roles under the disguise of cost cutting from March 2024 – August 2024 including head of AI strategy, head of digital marketing, marketing science director with abetment from Mr. Dolan and Mr. Luis and Mr. Lacorazza has replaced his entire team structure with 7 white direct reports and one Indian male hired in September 2024 as Ms. Whittington's replacement.

**U.S. Bank employees continue to retaliate against Mr. Nallasivan**

103.    After his unlawful termination from U.S. Bank, Mr. Nallasivan diligently sought new employment. After multiple rounds of interviews with a financial institution, including a meeting with the Chief Executive Officer, President, Executive Chairman of the Board, Mr. Nallasivan received a written offer of employment reporting to the president of the institution amongst glowing feedback regarding his experience and work product. The offer was substantially higher base salary than what he received at U.S Bank as well as a massive sign-on bonus. Mr. Nallasivan was told by the board chairman that he was excited for him to join their company.

104.    However, four days later, the financial institution's human resources department disclosed that Mr. Nallasivan was not a "cultural fit" and that the offer was going to be rescinded.

Mr. Nallasivan was informed that an employee at U.S. Bank had spoken negatively about Mr. Nallasivan, especially with regard to the "way" that Mr. Nallasivan left U.S. Bank, namely the investigation (which was discriminatory and retaliatory), and Mr. Nallasivan's engagement in protected activity.

105.  U.S. Bank continues to discriminate against, harass, and retaliate against Mr. Nallasivan. It is clear that individuals at U.S. Bank are interfering and attempting to prevent Mr. Nallasivan from finding gainful employment as an act of further retaliation. Left with no choice, Mr. Nallasivan brings this action regarding his wrongful termination, and to have U.S. Bank stop interfering with his ability to find a new job.

<u>**FIRST CAUSE OF ACTION**</u>
**Discrimination, Harassment, and Retaliation in Violation of Title VII**

106.  Mr. Nallasivan realleges and incorporates by reference all allegations in the preceding paragraphs.

107.  Upon information and belief, U.S. Bank employed at least 15 individuals and thus was an employer within the meaning of 42 U.S.C. § 2000e *et seq*. ("Title VII"). Title VII prohibits an employer from discriminating against its employees on the basis of race, ethnicity, national origin, and/or religion.

108.  At all times relevant hereto, Mr. Nallasivan was adequately performing his job for Defendants and was satisfying the legitimate expectations of his employer in the performance of his job.

109.  At all relevant times herein, Plaintiff has belonged to protected classes under Title VII.

110.  At all times relevant herein, Defendants have been aware of the provisions of Title VII which prohibit employment discrimination on the basis of a protected class. By subjecting Mr.

Nallasivan to a false and biased investigation, disciplining him, the submission of a false OCC document, erasing positive feedback from system regarding Mr. Nallasivan, and then terminating Mr. Nallasivan's employment, as well as the creation of a hostile work and retaliatory work environment, Defendants willfully, knowingly, and intentionally discriminated against Mr. Nallasivan on the basis of his race, ethnicity, national origin, and/or religion.

111.    Mr. Nallasivan engaged in protected activity when he reported the discrimination he faced on the basis of his race, color, national origin and/or religion. As a result, he was subjected to retaliation in the form of further harassment and ultimately termination

112.    In turn, Defendants have replaced Mr. Nallasivan with three White employees, both of whom lack the relevant experience (as admitted by themselves, Mr. Lacorazza, and employees [both senior leaders and members of the respective teams]), Ms. Whittington and have a number of ethics complaints filed against them. Mr. Venturo, also the subject of numerous ethic complaints, stole Mr. Nallasivan's hard work, his accolades, platforms, work product, and his AI team. These individuals took advantage of the hostile work environment fostered by the Defendants in order to justify a discriminatory and retaliatory termination of Mr. Nallasivan.

113.    Indeed, the Chief Risk Officer, among others, previously acknowledged that U.S. Bank has engaged in discriminatory and retaliatory terminations of other employees of color, over the years utilizing the similar or exact playbook utilized against Mr. Nallasivan.

114.    As a result of the existence of the employment relationship between the parties, the law of the State of North Carolina, and the United States support a public policy of anti-discrimination in obtaining and maintaining employment. The conduct of Defendants, as alleged herein, is in direct violation of the laws of the United States under Title VII. Thus, Defendants'

conduct constitutes discrimination, harassment, retaliation, and wrongful discharge under the laws of the State of North Carolina and the United States.

115.     Defendant's actions against Mr. Nallasivan were unfair, made in bad faith, and in violation of the public policy of the State of North Carolina as they were based on race, ethnicity, national origin, and/or religion.

116.     Defendants subjected Plaintiff to adverse actions as described herein.

117.     As a direct and proximate result of Defendant's conduct as stated above, Mr. Nallasivan has sustained and continues to sustain substantial losses in earnings, retirement benefits and other employment benefits, as well as emotional distress, all to him damage in a sum to be proven at trial.  Mr. Nallasivan prays leave of the Court to amend this Complaint when these damages are more fully known.

118.     Mr. Nallasivan timely filed a charge in writing with the Equal Employment Opportunity Commission (hereinafter "EEOC") charging Defendant with discrimination in its decision to discipline him, in its decision to terminate his employment, and the creation of a hostile work environment in its treatment of him while employed. More than 180 days have elapsed since Plaintiff filed these charges with the EEOC. Mr. Nallasivan was sent his right to sue letter on said charges of discrimination from the local office of the EEOC. At this time, Mr. Nallasivan has decided to institute a private lawsuit and is filing same within ninety (90) days of receipt of the EEOC's right to sue letter

119.     The discrimination, harassment, retaliation, and subsequent termination of Mr. Nallasivan by Defendant, by and through its duly authorized agents, is the direct and proximate cause of injury to Mr. Nallasivan in an amount in excess of $25,000.00 representing lost wages and benefits as well emotional distress.

## SECOND CAUSE OF ACTION
### Discrimination and Retaliation Under Section 1981

120.    Mr. Nallasivan realleges and incorporates by reference all allegations in the preceding paragraphs.

121.    42 U.S.C. § 1981 states, in the relevant part, as follows:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

122.    As described herein, Defendants discriminated against Plaintiff on the basis of HIS race in violation of Section 1981, by fostering, condoning, accepting, ratifying, and/or negligently failing to prevent or remedy a hostile work environment and terminating his employment.

123.    As a result of Defendant's unlawful discriminatory conduct in violation of Section 1981, Plaintiff suffered economic loss, for which he is entitled to an award of monetary damages and other relief.

124.    As described herein, Plaintiff engaged in activities protected by Section 1981 by complaining of racial discrimination and retaliation.

125.    After Plaintiff engaged in protected activities, Defendant retaliated against Plaintiff as described herein.

126.    Defendant would not have terminated Plaintiff, but for Plaintiff's complaints of discrimination and retaliation.

127.    Such retaliatory treatment would dissuade a reasonable employee from making or supporting a similar complaint of discrimination.

128.    As a result of Defendant's unlawful discriminatory and retaliatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, severe mental anguish

and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which Plaintiff is entitled to an award of monetary damages and other relief.

129. The unlawful discriminatory and retaliatory actions of Defendant constitute malicious, willful, and wanton violations of Section 1981, for which Plaintiff is entitled to an award of punitive damages.

## THIRD CAUSE OF ACTION
### Wrongful Discharge in Violation of North Carolina Public Policy

130. Mr. Nallasivan realleges and incorporates by reference all allegations in the preceding paragraphs.

131. Defendants employed at least fifteen (15) employees at all relevant times.

132. Defendants violated the public policy of North Carolina as set forth in N.C.G.S. § 143-422.1 by discriminating against, harassing, retaliating against, and terminating Plaintiff because of his race, ethnicity, national origin, and/or religion.

133. North Carolina has articulated a strong public policy against denying employment opportunities and/or discriminating against employees on account of their race, color, national origin and/or religion or in retaliation for complaining about discrimination.

134. Defendants violated North Carolina's public policy by subjected Mr. Nallasivan to a discriminatory pre-determined and pretextual investigation, by filing an unsubstantiated OCC document regarding Mr. Nallasivan (even after the acknowledgement from Chief Risk officer that investigation was bogus), and terminating Mr. Nallasivan after he exercised his rights and in good faith opposed what he viewed as illegal conduct as set forth in the paragraphs above.

135. As an actual, proximate, and foreseeable consequence of Defendants' conduct, Mr. Nallasivan has suffered lost income, emotional distress, anxiety, humiliation, expenses, and other damages and is entitled to recover compensatory damages in an amount to be determined at trial.

136. Defendants' actions were done maliciously, willfully or wantonly, and in a manner that demonstrates a reckless disregard for Mr. Nallasivan's rights. As a result of Defendants' conduct, Mr. Nallasivan is entitled to recover punitive damages in an amount to be determined at trial.

137. Defendants' officers, directors, and managers participated in and condoned the malicious, willful, wanton, and reckless conduct alleged above.

### FOURTH CAUSE OF ACTION
### Fraudulent Misrepresentation

138. Mr. Nallasivan realleges and incorporates by reference all allegations in the preceding paragraphs.

139. To induce Mr. Nallasivan to aid in Defendants' attempts to create a "new department" and set-up the organizational structure, U.S. Bank knowingly made misrepresentations that Mr. Nallasivan would be paid an 2023 LTI in excess of $100,000.

140. At the time of Defendants' representations, they knew of or recklessly disregarded the fact that they were false, or at a minimum, incomplete and misleading without the disclosure of additional information.

141. Defendants' misrepresentations were material to Mr. Nallasivan's decision to aid in the transition of his job duties and responsibilities.

142. Mr. Nallasivan reasonably relied on Defendants' misrepresentations and had no reason to suspect that the representations would be false.

143.    Defendants were aware that Mr. Nallasivan would have no reasonable way to fully investigate or otherwise discover the falsity of these statements, even with the exercise of due diligence, especially *since it was provided in writing.*

144.    As a direct and proximate result of the foregoing, Mr. Nallasivan has been damaged and is entitled to receive compensatory damages in an amount to be determined at trial of at least $100,000, as all of his hard earned LTI awards for exemplary performance and business results for 2022-2024 was revoked by U.S. Bank.

145.    Defendants' conduct was intentional, fraudulent, oppressive, malicious, and done with reckless disregard of its consequences, entitling Mr. Nallasivan to an award of exemplary damages under North Carolina law.

## FIFTH CAUSE OF ACTION
### Defamation

146.    Mr. Nallasivan realleges and incorporates by reference all allegations in the preceding paragraphs.

147.    As stated herein, upon information and belief, an employee and/or employees of U.S. Bank have made false statements regarding Plaintiff's tenure at U.S. Bank, to a potential employer of Mr. Nallasivan as well as several senior leaders in the company with an attempt to buttress their false claims and narratives against Mr. Nallasivan. *The HR team's direct intimidation to several c-suite executives and Vice Chairmans providing material positive facts in support of Mr. Nallasivan's integrity created a chilling effect on the leaders who stepped forward to speak the truth and not be part of actions in violation of the law.*

148.    The false representations were made intentionally to dissuade a financial institution from employing Mr. Nallasivan and upon information and belief, were meant to be understood to

mean that Plaintiff dishonest, breached U.S. Bank's policies, was unscrupulous and fraudulent in his profession, and was not a good employee.

149. The above statements were false, derogatory, and defamatory, which were done with malicious intent as a non-compete.

150. Defendants' either knowingly or negligently made the above statements to harm Mr. Nallasivan's reputation in the industry, and with his potential employer (who had already provided him with a written offer.

151. Defendants had no evidence to support the false statements made by him, but rather, spoke, wrote published, and/or cause the circulation of these false, derogatory, and defamatory statements with the intent of holding Mr. Nallasivan out in scorn, ridicule, disgrace, and to cause him to lose an offer of employment.

152. The above statements relating to Mr. Nallasivan also constitute defamation *per se* in that they allege Mr. Nallasivan's purported involvement in fraudulent activity.

153. As a direct and proximate cause of the false and defamatory statements, Mr. Nallasivan has suffered damages directly caused by the Defendants' defamatory statements in an amount in excess of $25,000.

154. Mr. Nallasivan has suffered other actual harm, including but not limited to impairment of his reputation and standing in the community and/or industry, personal humiliation and mental anguish and suffering. Mr. Nallasivan has also suffered presumed damages resulting from the defamation and defamation per se, including mental and physical pain and suffering as well as inconvenience and damage to her professional reputation. As a result, Mr. Nallasivan has been harmed and damaged in excess of $25,000.

155.    As a result of the actions of the Defendants as referred to herein above, Mr. Nallasivan is entitled to an award of punitive damages in an amount in excess of $25,000.

### SIXTH CAUSE OF ACTION
**Tortious Interference with Prospective Economic Advantage**

156.    Mr. Nallasivan realleges and incorporates by reference all allegations in the preceding paragraphs.

157.    Mr. Nallasivan had a job offer from another financial institution. The job offer would have created an economic relationship that would have resulted in an economic benefit to Mr. Nallasivan.

158.    Defendants knew of this relationship by way of the financial institution's reference checks to U.S. Bank employees.

159.    Defendants attempted to interfere with Mr. Nallasivan's job offer by making unsupported and/or false representations regarding Mr. Nallasivan.

160.    By engaging in this conduct, Defendants intended for its representations to persuade the financial institution to refuse to hire Mr. Nallasivan.

161.    Accordingly, by way of Defendants' representations, the financial institution withdrew its job offer of Mr. Nallasivan.

162.    Plaintiff lost his job offer and was harmed. Defendants' conduct was a substantial factor in causing Mr. Nallasivan's harm. As a result, Mr. Nallasivan has been harmed and damaged in excess of $25,000.

163.    As a result of the actions of the Defendants as referred to herein above, Mr. Nallasivan is entitled to an award of punitive damages in an amount in excess of $25,000.

## SEVENTH CAUSE OF ACTION
### North Carolina Wage and Hour Act

164.    The provisions of Article 2A of the North Carolina General Statutes Chapter 95 apply to Mr. Nallasivan's employment with Defendants.

165.    The North Carolina Wage and Hour Act ("NCWHA") defines an employer broadly to include "any person acting directly or indirectly in the interest of an employer in relation to an employee." N.C. Gen. Stat. § 95-25.2.

166.    Defendants had sufficient economic control over Plaintiff's terms of employment, job duties, working conditions, payroll, hiring, supervising, terminating, refusing to pay wages, and ability to take leave to be considered an "employer" under the NCWHA.

167.    The amounts owed by Defendants to Plaintiff as described in the paragraphs above constitute "wages" within the meaning of N.C. Gen Stat. § 95-25.1 *et seq.*

168.    Defendants promised wages to Plaintiff in the form of payment for work in transitioning over the last few months of employment with Defendants.

169.    Defendants were required to pay Plaintiff all promised wages accrued to Plaintiff on the regular payday.

170.    Defendants failed to pay Plaintiff promised wages in an amount to exceed $100,000 as promised for work in transitioning his duties.

171.    Defendants terminated Plaintiff's employment without paying those promised wages and still has not paid Plaintiff the owed compensation to date.

172.    Defendant's failure to pay Plaintiff her full and appropriately earned wages constitutes a violation of N.C. Gen. Stat. § 95-25.1 *et. seq.*

173.    As a direct and proximate cause of Defendant's actions, Plaintiff has suffered damages in the amount exceeding $25,000, exclusive of interests and costs.

174. Pursuant to N.C. Gen. Stat § 95-25.1 *et.seq.*, Plaintiff is entitled to, among other things:

      a. Such wages that are due to him at the time of judgment with pre-judgment interest from the date they became due;

      b. Liquidated damages; and

      c. Reasonable attorneys' fees and costs incurred in bringing this action.

## EIGHTH CAUSE OF ACTION
### Blacklisting

175. Defendants caused false information about Plaintiff to be communicated to a prospective employer of Plaintiff based on a false and discriminatory investigation and false allegations regarding Plaintiff's behavior.

176. Defendants knew or should have known in the exercise of reasonable diligence that the information it provided regarding Plaintiff was false.

177. The false information provided by Defendants resulted in an offer of employment being revoked for Plaintiff and Plaintiff's inability to secure new employment in his field.

178. Defendants intentionally and knowingly published false statements about Plaintiff to prevent him from maintaining employment in his field.

179. Defendant's statements are a "word or writing" within the meaning of the Blacklisting Statutes, N.C. Gen. Stat §14-355.

180. Plaintiff seeks an award of a civil penalty in an amount not less than $500 plus penal damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Mr. Nallasivan respectfully requests that this Court enter judgment in his favor and grant him the following relief:

(a) Afford Plaintiff a trial by jury on all claims so triable as alleged herein;

(b) Enter judgment in favor of Plaintiff and against Defendants on all of his claims set forth herein;

(c) Award Plaintiff all wages and compensation to which he is entitled, a sum in excess of $25,000 plus interest, to be determined at trial;

(d) actual, compensatory, consequential, statutory, special, liquidated, treble, and punitive damages against Defendants, jointly and severally;

(e) all damages allowable by law, common law, statute, rule, or regulation against Defendants, jointly and severally;

(f) pre-judgment and post-judgment interest against Defendants, jointly and severally;

(g) reasonable attorneys' fees and costs of the action against Defendants, jointly and severally;

(h) nominal damages, if other monetary damages are not awarded;

(i) injunctive relief to prohibit unlawful conduct in the future;

(j) that this matter be tried to a jury; and

(k) such other, further or different relief as the Court deems just, proper, or equitable.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38 of the North Carolina Rules of Civil Procedure, Plaintiff hereby

demands a trial by jury on all claims in this action.


Respectfully submitted, this 16th day of June 2025.


THE NOBLE LAW FIRM, PLLC

/s/ Victoria Kepes
Victoria T. Kepes, Esq.
(N.C. State Bar No. 47856)
Email: vkepes@thenoblelaw.com
Mitchell G. Davis, Esq.
(N.C. State Bar No. 54802)
Email: mdavis@thenoblelaw.com
700 Spring Forest Road, Suite 205
Raleigh, NC 27609
Telephone: 090-251-6008
Facsimile: 919-869-2079
*Attorneys for Plaintiff*

DHILLON LAW GROUP INC.

/s/ John-Paul Deol
John-Paul S. Deol (Pro Hac Vice forthcoming)
Michael R. Fleming (Pro Hac Vice forthcoming)
Email: jpdeol@dhillonlaw.com
Email: mfleming@dhillonlaw.com
177 Post Street, Suite 700
San Francisco, CA 94108
Telephone: 415-433-1700
*Attorneys for Plaintiff*

# STATE OF NORTH CAROLINA

MECKLENBURG County

File No.
25CV030195-590

In The General Court Of Justice
☐ District  ☒ Superior Court Division

| Name Of Plaintiff | |
|---|---|
| SRINI NALLASIVAN | |

**CIVIL SUMMONS**

☐ **ALIAS AND PLURIES SUMMONS (ASSESS FEE)**

Address
10509 Skipping Rock Lane

City, State, Zip
Concord, NC 28207

**VERSUS**

G.S. 1A-1, Rules 3 and 4

Name Of Defendant(s)
U.S. BANCORP; JOHN DOE NOS.1-10

Date Original Summons Issued

Date(s) Subsequent Summons(es) Issued

## To Each Of The Defendant(s) Named Below:

| Name And Address Of Defendant 1 | Name And Address Of Defendant 2 |
|---|---|
| U.S. BANCORP | |
| 160 Mine Lake Ct. Ste 200 | |
| Raleigh, NC 27615 | |

⚠️ **IMPORTANT! You have been sued!** These papers are legal documents, DO NOT throw these papers out! You have to respond within 30 days. You may want to talk with a lawyer about your case as soon as possible, and, if needed, speak with someone who reads English and can translate these papers!

**¡IMPORTANTE! ¡Se ha entablado un proceso civil en su contra!** Estos papeles son documentos legales. ¡NO TIRE estos papeles! Tiene que contestar a más tardar en 30 días. ¡Puede querer consultar con un abogado lo antes posible acerca de su caso y, de ser necesario, hablar con alguien que lea inglés y que pueda traducir estos documentos!

**A Civil Action Has Been Commenced Against You!**

You are notified to appear and answer the complaint of the plaintiff as follows:

1.  Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and

2.  File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

| Name And Address Of Plaintiff's Attorney (if none, Address Of Plaintiff) | Date Issued | Time |
|---|---|---|
| Victoria T. Kepes, Esq | 6/16/2025 | 4:57:49 pm ☐ AM ☒ PM |
| The Noble Law Firm, PLLC. | Signature | |
| 700 Spring Forest Road, Suite 205 | /s/ Harvey Frison | |
| Raleigh, NC 27609 | ☒ Deputy CSC  ☐ Assistant CSC  ☐ Clerk Of Superior Court | |

| ☐ ENDORSEMENT (ASSESS FEE) | Date Of Endorsement | Time |
|---|---|---|
| This Summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended sixty (60) days. | | ☐ AM ☐ PM |
| | Signature | |
| | ☐ Deputy CSC  ☐ Assistant CSC  ☐ Clerk Of Superior Court | |

**NOTE TO PARTIES:** *Many counties have **MANDATORY ARBITRATION** programs in which most cases where the amount in controversy is $25,000 or less are heard by an arbitrator before a trial. The parties will be notified if this case is assigned for mandatory arbitration, and, if so, what procedure is to be followed.*

(Over)

| | RETURN OF SERVICE | |
|---|---|---|

I certify that this Summons and a copy of the complaint were received and served as follows:

## DEFENDANT 1

| Date Served | Time Served ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

*Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)*

| ☐ Acceptance of service.<br>Summons and complaint received by: ☐ Defendant 1.<br>☐ Other: *(type or print name)* | Date Accepted | Signature |
|---|---|---|

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason:

## DEFENDANT 2

| Date Served | Time Served ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

*Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)*

| ☐ Acceptance of service.<br>Summons and complaint received by: ☐ Defendant 2.<br>☐ Other: *(type or print name)* | Date Accepted | Signature |
|---|---|---|

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason:

| Service Fee Paid<br>$ | Signature Of Deputy Sheriff Making Return |
|---|---|
| Date Received | Name Of Sheriff (type or print) |
| Date Of Return | County Of Sheriff |

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

ʼ

IN THE GENERAL COURT OF JUSTICE

SUPERIOR COURT DIVISION

CASE NO.: 25CV030195-590

SRINI NALLASIVAN,

Plaintiff,

v.

U.S. BANCORP; JOHN DOE NOS. 1-10,

Defendants.

**MOTION FOR ADMISSION**
*PRO HAC VICE*

NOW COMES Attorney Mitchell G. Davis ("Local Counsel"), a resident of the State of North Carolina and a member in good standing with the North Carolina State Bar ("NC Bar"), and moves, pursuant to N.C. Gen. Stat. § 84-4.1, for the admission of Michael R. Fleming and John-Paul S. Deol of the Dhillon Law Group, Inc. ("Applicants"), who seek permission to appear *pro hac vice* on behalf of the Plaintiff in the above-captioned action. In support of this Motion, Local Counsel respectfully shows the Court:

1.      The Statements of Applicants, attached as **Exhibit A,** set forth their qualifications to appear in this case pursuant to N.C. Gen. Stat. § 84-4.1.

2.      Mr. Fleming, Mr. Deol and Dhillon Law Group, Inc. are counsel of choice for the Plaintiff. A statement attesting to the retention of the Applicant and Dhillon Law Group, Inc. is attached to this Motion as **Exhibit B.**

3.      Pursuant to N.C. Gen. Stat. § 84-4.1(5) as local counsel in this matter and a resident of North Carolina, Local Counsel agrees to be responsible for filing the required registration statement for Applicants with the NC Bar. Additionally, a required fee pursuant to N.C. Gen. Stat. § 84-4.1 will be paid simultaneously to the Clerk of Mecklenburg County via the Odyssey File &

1

Serve system in the total amount of two-hundred and twenty-five dollars ($225) for the *pro hac vice* admission of Applicants.

WHEREFORE, for the reasons set forth herein, Local Counsel respectfully requests that the Court enters an Order allowing the admission of Michael R. Fleming and John-Paul S. Deol of Dhillon Law Group, Inc. to appear *pro hac vice* in this action.

Respectfully submitted, this 26TH day of June 2025.

THE NOBLE LAW FIRM, PLLC

/s/ Mitchell G. Davis

Mitchell G. Davis, Esq.
(N.C. Bar No. 54802)
Email: mdavis@thenoblelaw.com
Victoria T. Kepes, Esq.
(N.C. State Bar No. 47856)
Email: vkepes@thenoblelaw.com
The Noble Law Firm, PLLC
700 Spring Forest Road, Suite 205
Raleigh, NC 27609
Telephone: (919) 251-6008
Fax: (919) 869-2079
*Attorneys for Plaintiff*

2

**CERTIFICATE OF SERVICE**

I hereby certify that on the 26th day of June 2025, a copy of the **Summons, Cover Sheet, Complaint, and Motion for Admission to Appear** *Pro Hac Vice* were served on the following, in accordance with the North Carolina Rules of Civil Procedure, by depositing a copy in a pre-paid, properly addressed envelope in a post office or office depository under the exclusive care and custody of the USPS to be served and delivered via Certified Mail, Return Receipt Requested to the following:

U.S. Bancorp
Registered Agent: CT Corporation System
160 Mine Lake Ct. Ste 200
Raleigh, NC 27615 NC 27615
Tracking:

This, the 26th day of June 2025.

THE NOBLE LAW FIRM, PLLC

*Cicero Love IV*

Cicero Love, IV
Senior Litigation Paralegal
700 Spring Forest Road, Suite 205
Raleigh, NC 27609
Telephone: (919) 251-6008
Facsimile: (919) 869-2079
Email: clove@thenoblelaw.com

3

# EXHIBIT A

STATE OF NORTH CAROLINA
COUNTY OF MECKLENBURG

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
CASE NO.: 25CV030195-590

SRINI NALLASIVAN,

Plaintiff,

v.

U.S. BANCORP; JOHN DOE NOS. 1-10,

Defendants.

**STATEMENT OF
MICHAEL R. FLEMING
IN SUPPORT OF MOTION FOR
ADMISSION *PRO HAC VICE***

Pursuant to N.C. Gen. Stat. § 84-4.1(3)-(6), Michael R. Fleming hereby submits the following statement in support of the Motion for his admission to practice *Pro Hac Vice*:

1.      I am an Attorney in the law firm of Dhillon Law Group, Inc. I work at its offices located at 177 Post Street, Suite 700, San Francisco, California 94108. I was admitted to the State Bar of California on December 4, 2018, and I am an active member in good standing of the State Bar of California. I am also admitted to practice before and remain in good standing with the Courts in the following jurisdictions: United States District Court, Northern District of California (2019); United States District Court, Central District of California (2021); United States District Court, Eastern District of California (2021); United States District Court, District of Colorado (2019), State Bar of Washington D.C. (2025).

2.      I have never been the subject of any formal suspension or disbarment proceedings; never been denied admission *pro hac vice* in this or any other jurisdiction or had *pro hac vice* admission revoked; never had any certificate or privilege to appear and practice before any judicial or administrative body suspended or revoked; and I have never received public discipline by an court or lawyer regulatory organization.

2

3.     Plaintiff Srini Nallasivan ("Plaintiff") has retained my law firm, Dhillon Law Group, Inc., and me to represent him in connection with the above-captioned action.

4.     I will continue to represent Plaintiff in the above-captioned action until a final determination is reached, or I am permitted by order of this Court to withdraw from representation.

5.     I agree to be the subject to the orders and amendable to the disciplinary action and the civil jurisdiction of the North Carolina General Court of Justice and the North Carolina State Bar with respect to all matters incident to this action as if I were a regularly admitted and licensed member of the North Carolina Bar in good standing.

6.     The State Bar of California grants like privileges to practice on a *pro hac vice* basis to members of the North Carolina State Bar in good standing.

7.     I have associated and am personally appearing with Attorneys Victoria T. Kepes and Mitchell G. Davis in this action. Ms. Kepes and Mr. Davis are both attorneys practicing law at The Noble Law Firm, PLLC, in Raleigh, North Carolina, and are duly and legally admitted to practice in the General Court of Justice of North Carolina. Mr. Davis is a resident of North Carolina. Service of legal proceedings and disciplinary matters may be had upon them in this action with the same effect as if personally made upon me.

Respectfully submitted, this 26th day of June 2025.

/s/ Michael R. Fleming
Michael R. Fleming
(CA State Bar No. 322356)
**Dhillon Law Group, Inc.**
177 Post St Ste 700
San Francisco, CA 94108-4725
Telephone: 415-433-1700
Facsimile: 415-520-6593
Email: mfleming@dhillonlaw.com

3

STATE OF NORTH CAROLINA
COUNTY OF MECKLENBURG

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
CASE NO.: 25CV030195-590

SRINI NALLASIVAN,

    Plaintiff,

    v.

U.S. BANCORP; JOHN DOE NOS. 1-10,

    Defendants.

**STATEMENT OF
JOHN-PAUL S. DEOL
IN SUPPORT OF MOTION FOR
ADMISSION *PRO HAC VICE***

---

Pursuant to N.C. Gen. Stat. § 84-4.1(3)-(6), John-Paul S. Deol hereby submits the following statement in support of the Motion for his admission to practice *Pro Hac Vice*:

1.    I am an Attorney in the law firm of Dhillon Law Group, Inc. I work at its offices located at 177 Post Street, Suite 700, San Francisco, California 94108. I was admitted to the State Bar of California on December 3, 2012, and I am an active member in good standing of the State Bar of California. I am also admitted to practice before and remain in good standing with the Courts in the following jurisdictions: State Bar of Washington (2021); State Bar of Texas (2022); State Bar of New York (2022); State Bar of New York (2025); all District Courts in California, Texas, New York, and Colorado, the United States Court of Appeals for the Second, Fifth, Ninth, and Tenth Circuits.

2.    I have never been the subject of any formal suspension or disbarment proceedings; never been denied admission *pro hac vice* in this or any other jurisdiction or had *pro hac vice* admission revoked; never had any certificate or privilege to appear and practice before any judicial or administrative body suspended or revoked; and I have never received public discipline by a court or lawyer regulatory organization.

1

3.      Plaintiff Srini Nallasivan ("Plaintiff") has retained my law firm, Dhillon Law Group, Inc., and me to represent him in connection with the above-captioned action.

4.      I will continue to represent Plaintiff in the above-captioned action until a final determination is reached, or I am permitted by order of this Court to withdraw from representation.

5.      I agree to be the subject to the orders and amendable to the disciplinary action and the civil jurisdiction of the North Carolina General Court of Justice and the North Carolina State Bar with respect to all matters incident to this action as if I were a regularly admitted and licensed member of the North Carolina Bar in good standing.

6.      The State Bar of California grants like privileges to practice on a *pro hac vice* basis to members of the North Carolina State Bar in good standing.

7.      I have associated and am personally appearing with Attorneys Victoria T. Kepes and Mitchell G. Davis in this action. Ms. Kepes and Mr. Davis are both attorneys practicing law at The Noble Law Firm, PLLC, in Raleigh, North Carolina, and are duly and legally admitted to practice in the General Court of Justice of North Carolina. Mr. Davis is a resident of North Carolina. Service of legal proceedings and disciplinary matters may be had upon them in this action with the same effect as if personally made upon me.

Respectfully submitted, this 26th day of June 2025.

> */s/ John-Paul S. Deol*
> John-Paul S. Deol
> (CA State Bar No. 284893)
> **Dhillon Law Group, Inc.**
> 177 Post St Ste 700
> San Francisco, CA 94108-4725
> Telephone: 415-433-1700
> Facsimile: 415-520-6593
> Email: jpdeol@dhillonlaw.com

2

# EXHIBIT B

STATE OF NORTH CAROLINA
COUNTY OF MECKLENBURG

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
CASE NO.: 25CV030195-590

SRINI NALLASIVAN,

Plaintiff,

v.

U.S. BANCORP; JOHN DOE NOS. 1-10,

Defendants.

**STATEMENT IN SUPPORT OF
ADMISSION *PRO HAC VICE***

---

NOW COMES Plaintiff Srini Nallasivan and in support of the Motion for the Admission of Michael R. Fleming and John-Paul S. Deol of the Dhillon Law Group, Inc. *Pro Hac Vice,* shows the Court as follows:

1. The address of the Plaintiff is 10509 Skipping Rock Lane, Concord NC 28207.

2. Plaintiff has retained Michael R. Fleming and John-Paul S. Deol of Dhillon Law Group, Inc., to represent him in the above-captioned action.

This the 26TH day of June 2025.

*Srini Nallasivan*

Srini Nallasivan

1